**NEW SLEEP, INC., Plaintiff,**

v.

**DEPARTMENT OF EMPLOYMENT SECURITY, Defendant.**

No. 19543.

Supreme Court of Utah.

May 29, 1985.

Rehearing Denied Aug. 5, 1985.

J. Thomas Bowen, Salt Lake City, for appellant.

K. Allan Zabel, Winston M. Faux, Salt Lake City, for respondent.

HOWE, Justice:

This is a review of a decision of the Board of Review of the Industrial Commission of Utah which affirmed an order by an appeal referee that the plaintiff, New Sleep, Inc., was liable for contributions to the Utah Unemployment Compensation Fund on amounts it had paid to water bed installers.

New Sleep is engaged in the retail sale of water beds. When making a sale, New Sleep offers to install the bed for an additional charge if the customer desires that service. New Sleep contacts a water bed installer from a list kept by its warehouse manager. New Sleep utilized eleven installers in 1980, twelve in 1981, and nine in

1982, the years covered by this review. Most of the installers were students who installed water beds part-time. The warehouse manager contacted them as they were needed on a job to job basis. Some of the time the installers would call New Sleep in the morning to see if any work would be available during the day. Pay arrangements were informal. The rate of compensation was determined between the warehouse manager and the installer and was based on a flat rate (fixed price per job), an hourly rate or a combination of the two depending upon the circumstances of the individual job. New Sleep paid the installer upon completion of the installation. If the installation was defective, the installer was responsible for correcting it. New Sleep passed onto the installer the entire installation charge collected from the customer without retaining any part. Sometimes a customer would not order and pay for installation at the time of sale, but would afterwards request installation. In those cases, New Sleep would put an installer in contact with the customer and the customer would pay the installer directly.

The installers worked on their own without any direct supervision by New Sleep, generally used their own vehicles, and all of them provided their own tools. They were free to bring along additional help of their own choosing and to determine what compensation to pay them. The installers had no set working hours. They determined when and if they would work. New Sleep did not require them to be available for a minimum number of hours or to work on specific dates.

New Sleep did not consider the installers to be employees but regarded them as self-employed independent contractors. Some of them signed statements to that effect. New Sleep did not provide any insurance coverage on the installers and did not withhold either social security or federal or state income tax from amounts paid them. At the end of each year, New Sleep provided Internal Revenue Form 1099 to each installer who had earned more than $600. There was no evidence that any installer had ever filed a claim for unemployment compensation.

A field auditor of the Utah Department of Employment Security determined that the water bed installers were in the employment of New Sleep and that the latter was liable for contributions to the Utah Unemployment Compensation Fund on amounts paid them. This determination was upheld by a Decision Review Representative, an Appeal Referee, and the Board of Review.

U.C.A., 1953, 35–4–22(j)(1), provides a broad definition of "employment" thereby sweeping into the purview of the Employment Security Act, a broad spectrum of personal services. That section provides, " 'employment' means any service ... performed for wages or under any contract of hire written or oral, express or implied." However, subsequent subsections 5(A), (B), and (C) exclude from the operation of the Act those individuals who can meet certain requirements. Those subsections provide:

(5) Services performed by an individual for wages or under any contract of hire, written or oral, express or implied, are deemed to be employment subject to this act unless and until it is shown to the satisfaction of the commission that:

(A) The individual has been and will continue to be free from control or direction over the performance of those services, both under his contract of hire and in fact;

(B) The service is either outside the usual course of the business for which the service is performed or that the service is performed outside of all the places of business of the enterprise for which the service is performed; and

(C) The individual is customarily engaged in an independently established trade, occupation, profession, or business of the same nature as that involved in the contract of service.

The appeals referee found that the installers met neither the (B) nor (C) exclusionary test. For purposes of this appeal, it will be necessary for us to discuss only the (C) test.

■ We find no evidence that the (C) test had been met, that is, that the installers were customarily engaged in an independently established trade as we have defined that term in the decisions of this Court. Most of the installers were students; gaining an education was their main pursuit. They were so committed to their school work that during test week they were not available to do installations. New Sleep's warehouse manager and his assistant did the installations until these students were free again. It is significant that New Sleep did not call on them for their services in the first instance because they were known to be in the business of installing water beds or because they held themselves out to the public generally as being tradesman. The president of New Sleep testified that they were recruited to install water beds by the company's warehouse manager; "he has a network of friends, relatives, neighbors, ward members, and he calls them at various times to get whatever work is there to be done. It's been informal since day No. 1." In other words, New Sleep did not call upon persons who were already in that trade or business as one would when in need of a barber, physician, or plumber. The friends and relatives of the warehouse manager who were selected had to learn how to do an installation by accompanying someone with that knowledge and experience one or more times until they could do it themselves. Little skill and training were necessary. Again, the president testified that "most of the work is just carrying, lifting. It's not complicated. You have to know the sequence of events and you have to be strong." Most of the customers did their own installing. The necessary nuts, bolts, and screws came with the bed. The only tools that were needed were a screw driver, hammer, and an electric drill.

Some of the installers had other part-time work. They worked in warehouses, on docks of transportation companies, or doing delivery work. No evidence was presented that their other part-time work was in the practice and pursuit of an independently established business or trade.

On the contrary, from all that appears in the record, they were treated as part-time employees by those employers.

The installers were not known to anyone to be installers except to New Sleep. Customers and competitors of New Sleep who desired to find someone to install a water bed had to call New Sleep for the name of someone who would do the job. None of the indicia of an independently established tradesman or businessman were present: the installers did not hold themselves out to the public generally as being engaged in the business of installation of water beds (or any business); they had no clientele which called for their services; they had no place of business; they did no advertising; and they had no contractor's or business license. No significant skill nor period of apprenticeship was required. They had only a minimal investment in tools necessary to do their work. There is no evidence that they actively sought installation work directly from the general public—only from New Sleep. While the presence of all of the foregoing indicia is certainly not necessary, the absence of all of it leaves nothing to prove the existence of an independently established business. As we pointed out in *Leach v. Board of Review*, 123 Utah 423, 260 P.2d 744 (1953):

> Requirement (C) contemplates that the service rendered is a part of, and is rendered in pursuance of, a business of the person rendering the service, independently established, in which that person is customarily engaged. In other words, the "independently established business" must exist independent of the services under consideration in the sense that it is the whole—of which the particular service is a part.

That case noted that two of the installers had full time employment with other employers and one was a salesman. We concluded that because they were so employed, the services which they rendered for the plaintiffs did not emanate from any independently established business in which they were customarily engaged. On the contrary, they were customarily en-

gaged in employment elsewhere for other employers. In the instant case, most of the installers were customarily engaged as students. Their casual and part-time work for New Sleep fell far short of the level of being rendered in pursuit of a business independently established in which they were customarily engaged. In this respect their position was similar to that of the franchise dealers in *Leach v. Board of Review, supra,* where we remarked:

> Selling for the plaintiffs was the only or at least the main business of the dealers, if indeed it can be called a business. They had nothing aside from their relationship with the plaintiffs. When the services of a dealer were terminated by the plaintiffs, he became unemployed and had to secure employment elsewhere. He had no business of his own to fall back on—a business established independently of his relationship with the plaintiffs and from which his services for the plaintiffs emanate, a business in which he was customarily engaged aside from his relationship with the plaintiffs. The dealers' occupation was selling, but they had no independently established business as do brokers or commission merchants. None of the dealers held themselves out to the public as operating a sales agency.

New Sleep relies on *North American Builders, Inc. v. Unemployment Compensation Division,* 22 Utah 2d 338, 453 P.2d 142 (1969), as authority for its position. That reliance is misplaced as that case does not offer precedent for excluding the installers. In *North American Builders,* this Court held that certain installers of metal siding met the (C) exclusionary test. However, the installers there were not regularly employed elsewhere and, unlike the installers in the instant case, were not regularly pursuing a college education. They were generally known to and rendered services to all companies selling siding in the area, even to the extent that the companies had the names, addresses, and telephone numbers of the installers. Also, some of the installers were licensed by the State as specialty contractors. They pursued that line of work full-time and held themselves out as being tradesmen in that line. Our recent case of *Barney v. Department of Employment Security,* Utah, 681 P.2d 1273 (1984) does not aid New Sleep. There, nailers and finishers who met the (C) test pursued their trade full-time after serving a four year apprenticeship. They generally maintained offices at their home where they solicited and accepted business and kept books, records, and tools. Like the installers in *North American,* they worked for many contractors in the drywall business and were known to them. They paid self-employment quarterly taxes and provided their own insurance in the event of an injury on the job.

New Sleep seeks to make its case a stronger case for exclusion than *North American* because there the installation service came automatically with the purchase of the aluminum siding, whereas here the installation of the water bed was left to the customer's choice. That distinction does not aid the installers in meeting the (C) test. Whether the installation comes automatically with the purchase or is optional might bear on the (B) test, which requires that the service rendered be outside the usual course of the business for which such service is performed. In other words, an installation which is at the customer's option and is paid by a separate charge could arguably be claimed to be outside the usual course of the seller's business. However, whether the installation is automatically included with the purchase or is optional with the customer is of no consequence in determining whether the installer is customarily engaged in an independently established business of the same nature as that involved in the contract of service.

■ There was no error in the determination by the Department of Employment Security and the three levels of administrative review that the water bed installers in the instant case did not meet the (C) exclusion. The intent of the (C) test was to exclude from coverage only those workers

who had an independently established business to fall back on to supply their livelihood in case any one or more of the persons for whom they rendered personal services no longer needed them or went out of business. Such a worker would likely not need unemployment compensation and the (C) test relieved persons who paid for their services from the requirement of making contribution to the unemployment compensation fund on amounts paid them. The installers in the instant case fall far short of meeting that test. They were very largely, if not wholly, dependent on New Sleep for installation work as was the medical technician in *Blamires v. Board of Review*, Utah, 584 P.2d 889 (1978), who rendered his services only to one company.

■ The fact that the installers did not consider themselves employees and that some of them signed statements to that effect is immaterial. In *Leach v. Board of Review, supra*, and *Creameries of America Inc. v. Industrial Commission*, 98 Utah 571, 102 P.2d 300 (1940), similar disclaimers were contained in the contracts under consideration. We held that such provisions were ineffective to keep an individual outside the purview of the Employment Security Act when his activity brings him within it.

We have examined other contentions raised by New Sleep and find them without merit. We affirm the Board of Review.

STEWART and DURHAM, JJ., concur.

DEAN E. CONDER, District Judge (dissenting):

I dissent. From a review of the record, it is clear that the decision of the referee was unsupported by substantial evidence. In fact, the evidence clearly supports the conclusion that the (C) test had been met and that the installers were customarily engaged in an independently established trade as that term has been defined by this Court.

New Sleep is engaged in the retail sale of water beds. When a sale is made, New Sleep offers to arrange delivery and installation for an additional charge. If the customer desires this service, New Sleep contacts a "waterbed installer" from a list kept by plaintiff's warehouse manager.[1] New Sleep utilized eleven installers in 1980, twelve in 1981, and nine in 1982, the years covered by this appeal. Most of the installers were students, who installed water beds part-time. New Sleep contacted the installers on a job-by-job basis. The pay arrangements were informal. The rate of compensation was determined between the warehouse manager and the installer and was based on a "flat rate" (fixed price per job), hourly rate, or a combination of the two, depending upon the circumstances of the individual job. New Sleep paid the installer upon completion of the job; there was no mechanism to hold back payment pending customer approval. If the installation was defective, the installer was responsible for correcting the problem. New Sleep passed on to the installer the entire installation fee collected from a customer, without retaining any profit.

The installers worked on their own without any direct supervision by New Sleep, although New Sleep preferred to use a few "good installers" more often than the others. The installers generally used their own vehicles, and all of them provided their own tools. They were free to bring along additional help of their own choosing, and they determined what compensation to pay their help.

The installers had no set working hours; they determined when and if they would work. New Sleep did not require them to be available for any minimum number of hours or to work on specific days. The installers did similar work for New Sleep's competitors. They also installed water beds for individuals who purchased water beds either from New Sleep or its competitors and who later decided to hire someone to install them. In these cases, the installer negotiated directly with and collected directly from the customer.

---

1. On some occasions, the installers would call New Sleep to inquire if work was available.

The installers did no work for New Sleep in any other function; they were neither warehousemen nor salesmen. There was testimony that one or two of them helped infrequently with rearranging the showroom floor, although the record does not reflect whether or under what terms they received compensation. The installers did not consider themselves employees, and some signed statements to that effect. They never requested days off or insurance coverage, and, as of the time of the hearing before the appeal referee, none had ever filed for unemployment compensation. New Sleep provided tax form 1099 (income for self-employed) to each installer who earned more than $600 in a given year.

Based on the facts above, the appeal referee found that the installers were under a "contract of hire" with New Sleep and that since the installers did not fit within the exclusion of section 35–4–22(j)(5)(A)–(C), the so-called "ABC test," New Sleep was liable for contributions to the unemployment compensation fund.

The ABC test is in the conjunctive: once a contract of hire exists, the hirees must meet all three parts of the test before they are excluded from coverage. The referee concluded that there was a contract of hire and that the installers qualified under subsection (A) (free from control over performance), but that they failed to meet the tests in subsections (B) and (C). The referee found that the installers did not meet test (B) because New Sleep "is in the business of selling and installing water beds, and therefore the services of the installers were within [New Sleep's] course of business." Regarding test (C), the referee concluded:

Test C requires that the individuals performing services be independently established in a similar trade or business. There is no substantial evidence to indicate that any of the installers were established in any business. They were part-time workers who may have also worked part-time for others, but were not self-employed. They did not advertise or solicit for business, or if they did there is no evidence of such. They re-

ceived their pay from the appellant in practically all cases and, under the circumstances, it is held that Test C is not met.

New Sleep does not contest the existence of a contract for hire. It contends that the referee improperly applied the facts to the law when it determined that the installers failed to meet tests (B) and (C).

On review, we apply an "intermediate standard" to determine "whether the facts support the conclusion of law...." *Barney v. Department of Employment Security,* Utah, 681 P.2d 1273, 1275 (1984).

A decision of the Board of Review of the Department of Employment Security, such as the one before us, is entitled to weight, but is subject to judicial review to assure that it falls within the limits of reasonableness or rationality. Issues governed by this "intermediate" standard, this Court stated, include "what has been described as 'mixed questions of law and fact' or the 'application' of the findings of basic facts ... to the legal rules governing the case."

*Id., quoting Utah Department of Administrative Services v. Public Service Commission,* Utah, 658 P.2d 601, 610 (1983).

The referee failed to recognize that (B) provides two alternatives: either the service is performed outside of the usual course of business *or* the service is performed outside of all places of business of the hiring party. *See Blamires v. Board of Review,* Utah, 584 P.2d 889, 891 (1978). The referee misapplied the facts to the legal rules. There is no dispute that the installers performed their services at the customers' homes, not at New Sleep's place of business. Further, the installation of the water bed was left entirely to the customer's discretion and was the subject of an additional charge which was paid in total to the installer. Thus, installation of the beds was outside the usual course of business of the seller. Test (B), therefore, was clearly met in this case.

The referee also incorrectly applied test (C) to the facts. The Court has rejected findings similar to those of the referee

twice before. *See Barney v. Department of Employment Security*, 681 P.2d at 1275, and *North American Builders, Inc. v. Unemployment Compensation Division*, 22 Utah 2d 338, 342, 453 P.2d 142, 145 (1969). In *North American*, the finding of "employment" under (C) was reversed, notwithstanding the fact that the aluminum siding installers in that case received their compensation from the hiring party for every job and notwithstanding the fact that the installers did not advertise. Advertising was unnecessary because in that case the two groups were known to each other. 22 Utah 2d at 340, 453 P.2d at 143. In *Barney*, the Court reversed the finding of "employment," even though the referee found that the drywall installers were "employed" by more than one employer and not self-employed. These facts were not, and are not, dispositive. Finally, the referee's finding that the installers did not solicit for business is without any evidentiary basis in the record. The evidence indicated that the installers did solicit business from time to time by calling New Sleep when they wanted work. There was no evidence to the contrary.

The facts upon which the referee based his finding do not support the conclusion he reached. The installers worked if, when, and for whom they desired, used their own tools and vehicles, and hired their own helpers. The fact that many of the installers were also students is irrelevant in this case. The facts of the instant case go beyond *North American*, where the installation service came automatically with the purchase of aluminum siding, and *Barney*, where there was no evidence that the drywall installers performed their service for anyone other than contractors. When New Sleep sold a water bed, installation was optional. The water bed installers at issue here performed their services for New Sleep, for its competitors, *and* directly for the individual customers of either. On the facts of this case, test (C) was also met; the installers were engaged in the independently established trade of water bed installation.

I would reverse the decision of the Board of Review that tests (B) and (C) were not met.

HALL, C.J., concurs in the dissenting opinion of DEAN E. CONDER, District Judge.

ZIMMERMAN, J., does not participate herein.

DEAN E. CONDER, District Judge, sat.